IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FEB  5 2016

CLERK, U.S. DISTRICT COURT
By
Deputy

UNITED STATES OF AMERICA

v.                                              Case No. 3:16-MJ-078

| | |
|---|---|
| MARCOS BATZ | (01) |
| HELIODORO CATALAN | (02) |
| JOSE FLORES | |
| a/k/a Gordo | (03) |
| FNU LNU 1 | (04) |
| ARTEMIO VILLA HERNANDEZ | (05) |
| MANUEL GONZALEZ | (06) |

S E A L E D
UNTIL WARRANT EXECUTED

## CRIMINAL COMPLAINT

I, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

Beginning in or around August 2014, and continuing until on or about February 2, 2016, in the Fort Worth Division of the Northern District of Texas, and elsewhere, defendants **Marcos Batz, Heliodoro Catalan, Jose Flores,** also known as Gordo, **FNU LNU 1, Artemio Villa Hernandez**, and **Manuel Gonzalez** did knowingly and intentionally conspire with each other, and others both known and unknown to the Complainant to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C §§ 841(a)(1) and (b)(1)(B) and 846 and to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (B) and 846.

1.     Complainant is a Special Agent of the Federal Bureau of Investigation (FBI). I have been so employed for approximately thirty-one (31) years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereinafter referred to as the Task Force). The Task Force is comprised of agents, investigators and police officers from the FBI, The Texas Department of Public Safety, the Arlington, Texas Police Department (APD), the Fort Worth, Texas Police Department (FWPD) and the Texas Department of Public Safety (DPS). Agents of the Bureau of the Alcohol Tobacco and Firearms (ATF) have also participated in this investigation.

2.     Beginning in September 2013, the Task Force initiated an investigation targeting a number of Dallas/Fort Worth area subjects and their activities to import and distribute Ice and cocaine. The investigation was predicated on information received from other law enforcement agencies and from a number of Confidential Human Sources (CHS) and Confidential Informants.

3.     In November 2014, the Complainant began receiving information from a Confidential Human Source (CHS 1), who was associating with a number of well-connected drug dealers. The Complainant had previously worked with CHS 1 on other similar drug investigations. During his earlier association with CHS 1, the Complainant found the information provided by CHS 1 to be truthful, accurate and timely. Based on his interaction with CHS 1 during these earlier investigations, the Complainant knew CHS 1 to be dependable and reliable and CHS 1's information to be accurate and true.

4.     In November 2014, CHS 1 began providing information regarding **Marcos Batz** and **Batz's** connections to a number of Sources of Supply (SOS) for cocaine and methamphetamine, also known as crystal Ice or Ice. Using various investigative techniques, the Complainant verified the information CHS 1 provided regarding **Batz**. These techniques included the review of toll records for **Batz's** cellular telephones and consensually recorded telephone calls and meetings. These investigative techniques showed that CHS 1's information regarding **Batz** was accurate and true. CHS 1 also provided information regarding a number of other drug dealers. CHS 1's information regarding these dealers was also verified and showed that CHS 1's information regarding these dealers was also true and correct. Based on his recent interaction with CHS 1, the Complainant continues to believe CHS 1 to be truthful and the information received from CHS 1 to be reliable and credible. CHS 1 does have a criminal history, but CHS 1 has no pending charges. CHS 1 is a paid informant of the FBI.

5.     Based on information from CHS 1, it was determined that **Batz** was actively seeking to connect CHS 1 with various SOS, who could provide CHS 1 with both cocaine and Ice.

Criminal Complaint – Page 2

6.     Over the course of this investigation, CHS 1's personal and telephonic interactions with the subjects of the investigation were routinely recorded. The controlled buys detailed below conducted by CHS 1 were surveilled by investigators and were also recorded. The details of the investigators' surveillance of the controlled buys are described below. After the paragraphs detailing the surveillance, CHS 1's summary of the transaction is provided. However, the recordings of the controlled buys will ultimately serve as the best evidence.

7.     After the controlled buys, the drug evidence obtained from the controlled buys was submitted to the DEA Laboratory in Dallas, Texas. After the submissions, the DEA Laboratory advised the investigators that due to an extreme backlog, the evidence would not be examined without a set trial date or law enforcement necessity. Except where noted below, the DEA Laboratory exams are still pending. Recently, at the request of the FBI, the DEA Laboratory has begun to examine the submitted drugs evidence with larger quantities.

8.     After meeting **Batz**, **Batz** quickly introduced CHS 1 to a supplier he knew, **Jose Flores**. **Batz** provided CHS 1 with **Flores'** cell phone number and told CHS 1 that **Flores** could supply CHS 1 with Ice and cocaine or could introduce CHS 1 to others who would be able to supply Ice and cocaine. CHS 1 began to meet with **Flores** and discuss purchases of Ice and cocaine.

9.     On November 14, 2014, CHS 1 met with a number of subjects. At 1:00 pm, the Complainant and SA Tim Smylie met with CHS 1 at a pre-arranged location. At 1:47 pm, CHS 1 placed a call to **Flores**. **Flores** advised CHS 1 to meet him at the Shell gas station, located off of I-45 and Illinois, Dallas, Texas. **Flores** told CHS 1 that he would be driving a tan Kia SUV. At 1:57 pm, the investigators and CHS 1 departed the meeting location. At 2:24 pm, CHS 1 arrived at the Shell gas station, at 3915 Linfield, Dallas, Texas. CHS 1 was observed outside of his/her vehicle. CHS 1 and **Flores** were observed entering CHS 1's vehicle. At 2:26 pm, CHS 1 departed the Shell gas station. CHS 1 traveled north on I-45 and exited at the Lamar exit. CHS 1 proceeded west on Lamar. At 2:29 pm, CHS 1 turned north on Forest Avenue and immediately entered the parking lot of a shop located on the northwest corner of the Lamar/Forest intersection. CHS 1 arrived at the **Catalan** Body Shop, 1209 Forest Ave., Dallas, Texas. At 2:33 pm, CHS 1 and **Flores** exited CHS 1's vehicle and entered a tan Mazda MPV minivan. At 2:36 pm, an unknown Hispanic male, later identified as **Heliodoro Catalan**, exited the van and entered the shop through the entry door. At 2:38 pm, **Catalan** exited the shop and re-entered the van. At 2:42 pm, CHS 1 and **Flores** exited the van and entered CHS 1's vehicle. CHS 1 traveled east on Lamar and south on I-45.

At 2:47 pm, CHS 1, followed by the Complainant and SA Edmond Grant and TFO David Dickie, proceeded to a prearranged meeting location. At 3:15 pm, CHS 1 met with the Complainant, SA Grant and TFO Dickie at the pre-arranged meeting location.

10.     On November 14, 2014, CHS 1 provided details of the meeting with **Flores** and **Catalan**. CHS 1 reported that **Flores** said he worked at the Shell gas station off of Illinois. **Flores** also worked at another gas station located near Fair Park in Dallas. **Flores** told CHS 1 that the only reason he worked at these gas stations at night is to sell cocaine through the windows. The main doors at both stations are locked in the evenings. **Flores**'s wife also worked at the gas stations. **Flores'** customers would come to the windows and he would pass the drugs to them through the customer window. **Flores** knew when the customers were coming and he passed the drugs to them in a paper sack. **Flores** sold smaller amounts of cocaine, up to a "juice' or four and half ounces. When CHS 1 and **Flores** left the gas station, a Dallas police patrol vehicle was parked in the parking lot. **Flores** told CHS 1 that they should leave in the same vehicle so that they would not appear suspicious. **Flores** directed CHS 1 to the body shop. When CHS 1 exited his/her car at the **Catalan** Body Shop, CHS 1 asked **Flores** whether they were going into the shop. **Flores** told CHS 1 that they were not entering the shop and he directed CHS 1 to enter the van. When CHS 1 entered the van, **Catalan** was sitting in the van. **Catalan** had a either a .38 or 45 caliber semi-automatic pistol in his lap. **Catalan**, who told CHS 1 to call him **Catalan**, told CHS 1 that he bought kilograms of cocaine, broke them down and sold the cocaine by the ounce. **Catalan** told CHS 1 that he charged $1100 per ounce and he sold the cocaine to black customers all day from the van. **Catalan** told CHS 1 that the cocaine was good quality and his customers cook the cocaine into crack. **Catalan** pledged to get CHS 1 the best price for the drugs. **Catalan** told CHS 1 that his supply of drugs would be consistent and that he could supply three to five kilos or more at a time. **Catalan** told CHS 1 that if he/she bought a kilogram of cocaine it would not come in a bag. **Catalan** told CHS 1 that the cocaine, which would be good quality, would be in brick form with a stamp. CHS 1 stated that **Catalan** left the van, went into the shop and returned with what CHS 1 estimated to be a quarter kilogram of cocaine in a zip lock bag. **Catalan** broke a small sample off of a corner of the cocaine, wrapped it in plastic and provided it to CHS 1. CHS 1 provided the Complainant with the small sample of cocaine provided to him by **Catalan**. **Catalan** told CHS 1 that if he/she wanted a kilogram of cocaine tomorrow, he would have it at the shop for him/her the next day. **Catalan** told CHS 1 that he could quickly provide a kilogram or more of cocaine. **Catalan** told CHS 1 to let **Flores** when he/she wanted cocaine and **Flores** would let **Catalan** know. **Catalan** told CHS 1 that he would give CHS 1 his number after they had done some deals. **Catalan** told CHS 1 that the price per kilogram would vary. **Catalan** told CHS 1 that he would currently sell a kilogram of cocaine for $30,000 to $31,000 per kilo. CHS 1 told **Catalan** that his/her customers would want a lower price than that.

Criminal Complaint – Page 4

CHS 1 told **Catalan** that he would be able to see the money before the deal was completed. **Catalan** told CHS 1 that he could also supply crystal Ice or Ice to CHS 1 for a good price. **Catalan** agreed that $6500 a pound was too high for Ice. **Catalan** told CHS 1 that he would know a price per pound by this weekend.

11.     On November 14, 2014, CHS 1 provided the Complainant with the small sample of cocaine obtained from **Catalan**. After receiving the sample of cocaine, the Complainant transported the sample to the Dallas FBI Evidence room. The Complainant and SA Edmond Grant field tested the drugs. The field test for the sample tested positive for the presence of cocaine. The drugs and packaging material from the sample were determined to weigh .05 ounces. This evidence of sample of cocaine and packaging was designated 1B9.

12.     On December 17, 2014, CHS 1 made a controlled purchase of one kilogram of crystal Ice from **Catalan** for $15,000. At 1:28 pm, CHS 1 arrived at the prearranged meeting location. At 1:38 pm, CHS 1 departed the meeting location followed by investigators. At 1:52 pm, CHS 1 arrived at the Shell gas station, 3915 Linfield, Dallas, Texas. A tan Kia SUV, Texas license plate DRT4226, known to be driven by **Flores**, was observed parked on the east side of the northwest gas pumps by the Complainant. At 1:53 pm, CHS 1's vehicle followed the Tan Kia east to I-45 and north on I-45. Both vehicles exited Lamar from I-45 and traveled west on Lamar to Forest. Both vehicles pulled into the parking lot of **Catalan**'s body shop. CHS 1 exited his/her vehicle and was observed talking to the driver of the red Infiniti. CHS 1 walked back to his/her vehicle. At 2:01 pm, the overhead shop door was closed. CHS 1 was observed outside of the shop. CHS 1 joined **Catalan** in the Infiniti. A single cab Nissan pickup truck pulled into the shop parking lot. At 2:03 pm, a silver sedan, Texas license DXP7417, possibly a Nissan, driven by a young Hispanic male, later identified as **Artemio Villa Hernandez,** pulled into the shop parking lot. The registration on this license was to a silver 2006 Hyundai Tiburon. At the time of this transaction, the Hyundai was registered to **Artemio Villa Hernandez**, XXX Sugarleaf, Dallas, Texas. At 2:09 pm, the sound of money being counted was overheard on the listening device. At 2:13 pm, the overhead shop door was opened. At 2:14 pm, **Catalan** was observed directing CHS 1 as CHS 1 backed his/her vehicle out of the shop. At 2:15 pm, CHS 1 departed the shop, followed by the Complainant and SA Grant to a pre-arranged meeting location, where he/she was debriefed.

13.     On December 17, 2014, CHS provided information regarding the controlled buy. CHS 1 telephonically reported to the Complainant that the young Hispanic male, later identified as **Artemio Villa Hernandez**, in the silver/grey car, possibly a Nissan, brought the kilogram of Ice to the shop.

**Criminal Complaint – Page 5**

CHS 1 also reported that shortly after CHS 1 left the shop, **Flores** had called and asked whether everything had gone okay and was CHS 1 happy.  CHS 1 told **Flores** that he/she would call him back.  CHS 1 reported that **Flores** had called and told CHS 1 that **Catalan** had sold his three remaining kilograms of cocaine to a black male for $31,000.  **Flores** said that all of **Catalan's** cocaine was now gone.  CHS 1 gave CHS 1's number to **Catalan**, so that **Catalan** could call CHS 1 when he has more cocaine available. **Catalan** was supposedly traveling to Mexico on Friday, December 19, 2014.  **Catalan** would return on January 3, 2015.  **Catalan** intended to leave someone in charge to sell Ice while he was gone.  **Catalan** did not fully trust his workers, but he told CHS 1 that he/she could buy Ice while he was gone to Mexico.  **Catalan** told CHS 1 that he would call CHS 1 when he returned from Mexico and let him/her know when he had cocaine available.  CHS 1 asked **Catalan** whether he/she could deal directly with him since there would be times that **Flores** was working and would be unavailable.  **Catalan** told CHS 1 to wait until after he returned from Mexico and he would arrange for further purchases. CHS 1 reported that **Catalan** was in the red Infiniti when he/she arrived at the shop. CHS 1 pulled into the shop behind **Flores**.  **Flores** told CHS 1 to go to the Infiniti and talk to **Catalan**.  As CHS 1 approached the Infiniti, **Flores** left.  **Flores** said that he did not want to have too many cars at the shop to arouse suspicion.  CHS 1 talked to **Catalan** at the window of the Infiniti.  **Catalan** told CHS 1 to open the hood of his/her car.  After briefly looking under the hood of CHS 1's vehicle, **Catalan** told CHS 1 to pull the vehicle into the shop.  CHS 1 then returned to the Infiniti.  CHS 1 did return to the shop to lock his/her car, fearing that they could steal the money.  CHS 1 waited in the Infiniti for the Ice to arrive.  CHS 1 reported that only **Catalan** and an older Hispanic male were in the shop.  CHS 1 reported that the small silver/grey car, possibly a Nissan, delivered the Ice to the shop.  CHS 1 described the driver of the delivery car as a Hispanic male, 6' tall, 170 pounds, 22 or 23 years old.  CHS 1 stated that he and **Catalan** sat in the Infiniti waiting for the delivery.  After approximately five minutes, the grey car pulled into the shop lot.  **Catalan** told CHS 1, "Here he is. Go into the shop." The driver of the grey car brought a plastic container with the Ice inside.  CHS 1 stated that **Catalan** had a scale in the shop and they weighed the drugs.  The only thing the driver of the grey car said was that the package would weigh more that a kilogram because of the container. **Catalan** set the scale to weigh in kilograms rather than pounds.  CHS 1 stated that **Catalan**'s scale showed that the package weighed 1.09 kilos.  **Catalan** counted the money.  CHS 1 stated that **Catalan** did not call the driver by a name.  **Catalan** told CHS 1 that there was not a lot of cocaine available, but there was a lot of Ice around.  CHS 1 stated that they went to the office of the shop to count the money.  **Catalan** gave CHS 1 a small sample of cocaine.  CHS 1 provided the sample to the Complainant. **Catalan** did have six ounces of cocaine in the office, which he was going to get rid of. The cocaine was stored in the bottom of a false spray can.  **Catalan** told CHS 1 that there would be no more cocaine until **Catalan** got back from Mexico.

CHS 1 stated that the old man, who CHS 1 described as 70 years old, was complaining about the weather and how cold it was. **Catalan** told CHS 1 that if CHS 1 purchased more Ice next time then the price would not be so high. **Catalan** told CHS 1 that he would get CHS 1 a better price. The scale used to weigh the Ice was removed from a tool box. There was a shelf with a number of paint spray cans on it. **Catalan** unscrewed the bottom of one of the cans and gave CHS 1 the cocaine from the can.

14.    On December 17, 2014, the Complainant took custody of the kilogram of Ice and cocaine sample from CHS 1 and transported the drugs to the Evidence Room, Dallas FBI, where he was met by SAs Smylie and Grant. SA Smylie took eleven (11) photographs of the drugs at the Dallas FBI Evidence room prior to and after packaging. The cocaine sample and the plastic packaging were determined to weigh two (2) grams. The cocaine was field tested and the test resulted in a positive reaction for the presence of cocaine. Once the drugs and packaging were placed into a heat sealed kpac evidence bag with the appropriate label, the total package weight was determined to be 31.4 grams. This cocaine sample was designated evidence number 1B 10. The drugs and packaging material from the one (1) kilogram Ice purchase were determined to weigh 1137.0 grams. The Ice was field tested and the test resulted in a positive reaction for the presence of Ice. Once the drugs and packaging were placed into a heat sealed kpac evidence bag with the appropriate label, the total package weight was determined to be 1685.8 grams. This evidence of one (1) kilogram of Ice/Ice and packaging was designated evidence number 1B 11.

15.    On January 5, 2015, CHS 1 met **Flores** and received a cocaine sample from him. At 1:32 pm, CHS 1 arrived at the Migueleno Restaurant, 3620 W. Davis Boulevard, Dallas, Texas. CHS 1 parked in front of the restaurant. At 1:54 pm, a tan Kia Sorento, known to be driven by **Flores**, was observed westbound on Fort Worth Avenue. At 1:55 pm, the tan Kia SUV, Texas license DRT4226, arrived at the restaurant. At 2:57 pm, the Kia departed the restaurant, traveled east on W. Davis and south on Westmoreland. At 2:58 pm, CHS 1 departed the restaurant and proceeded to a pre-arranged meeting location, where he/she met with investigators. CHS 1 advised that **Flores** had provided him/her with a sample of cocaine. CHS 1 provided this sample to the Complainant. The sample was in a small green-tinted plastic zip lock baggie.

16.    On January 5, 2015, CHS 1 stated that when he/she and **Flores** walked out of the restaurant, **Flores** went to the rear driver's door of the Kia. **Flores** reached up under the rear seat and pulled a plastic container out from under the seat. The plastic container had three different sized plastic baggies which each contained three different amounts of cocaine. CHS 1 estimated that one size contained ¼ ounces and the second contained eight balls. CHS 1 could not estimate the weight of the third package. **Flores** and CHS 1 discussed various suppliers for cocaine to whom **Flores** had access.

17.    On January 5, 2015, after receiving the sample of cocaine, the Complainant transported the sample to the Dallas FBI Evidence room. The sample was in a small green-tinted plastic zip lock baggie. Investigators field tested the drugs. After an initial field test was inconclusive, a second field test was conducted. This second test did show a positive result for the presence of cocaine. This evidence was designated evidence item 1B 12.

18.    On January 22, 2015, **Flores** introduced CHS 1 to a cocaine supplier, who was later identified as FG, the subject of a separate criminal complaint in this investigation, and the supplier provided CHS 1 with a sample of cocaine. FG and CHS 1 met and traveled to Garcia's Shop, 312 N. Lancaster, Dallas, Texas, where they met FG.

19.    On January 22, 2015, after meeting with FG and **Flores**, CHS 1 met with the investigators. CHS 1 reported that when they arrived in front of Garcia's shop, **Flores** called FG and told him that they were on the street. FG walked out of the shop and got into the back seat of CHS 1's vehicle. Once FG met CHS 1 and **Flores**, he got out of CHS 1's vehicle and went into the shop. FG came back to CHS 1's vehicle with the sample of cocaine. The cocaine was in a sandwich style plastic bag with the fold over top.  The cocaine dealer was introduced as Felipe (FG). FG offered CHS 1 a large rock of cocaine, which CHS 1 estimated to weigh an ounce. Fearing that the investigators would not pay for the cocaine, CHS 1 told FG that he/she only wanted a small sample. FG broke off a small sample from the larger portion of cocaine and gave it to CHS 1. FG then gave the remaining cocaine to **Flores**. Based on what **Flores** told CHS 1, CHS 1 believed that FG was associated to the Mexican male cocaine, Ice and marijuana supplier, who lives off of I-30 west of Dallas. CHS 1 also believed that FG was associated with **Catalan.** FG told CHS 1 that he had "enough work" or enough cocaine to supply his customers for a month.  FG quoted a price of $31,000 for a kilogram of cocaine.

20.    On January 22, 2015, the Complainant transported the cocaine sample obtained from FG to the Dallas FBI Evidence room.  The sample was packaged in a folded slip of white paper.   Investigators field tested the drugs. A field test was conducted. This test did show a positive result for the presence of cocaine. This evidence was designated evidence item 1B 13.

21.    During meetings with **Flores**, CHS 1 learned that **Flores** knew both **Catalan**, a Dallas area drug distributor, and FG, who is the subject of a separate criminal complaint in this investigation.

22.     On January 27, 2015, CHS 1 met with **Flores,** and **Flores** provided CHS 1 with a sample of Ice. At 1:50 pm, CHS 1 arrived at the Shell gas station, 3915 Linfield, Dallas, Texas. A tan Kia SUV, Texas license plate DRT4226, driven by **Flores**, was observed at a gas pump in gas station parking lot. **Flores** got out of the Kia and got into CHS 1's vehicle. At 2:12 pm, CHS 1 departed the gas station. CHS 1 provided the investigators with the sample of Ice that **Flores** had provided.

23.     On January 27, 2015, the Complainant transported the sample of Ice obtained from **Flores** to the Dallas FBI Evidence room. The sample was in a small plastic zip lock baggie. Investigators field tested the drugs. The field test did show a positive result for the presence of Ice. SA Tim Smylie took three photographs of the evidence, the weighing and packaging of the evidence and the positive field test. This evidence was designated evidence item 1B 16.

24.     On January 29, 2015, CHS 1 made a controlled buy of one kilogram of Ice from **Catalan** for $15,000. At 1:20 pm, surveillance was established in the vicinity of **Catalan**'s Shop, 1209 Forest Avenue, Dallas, Texas. TFO David Dickie observed a red Dodge passenger car parked near the bay door of the shop facing Forest Avenue. A blue crew cab pickup and a black Cadillac four (4) door passenger car were parked next to each other, with both vehicles parked parallel to Forest Avenue. A tan Ford pickup was parked in front of the bay door upon arrival of the surveillance units, but left shortly after surveillance began. The bay door of the shop was open upon arrival and a Hispanic male was working on a vehicle just inside the shop. The bay door was closed shortly after surveillance was initiated. The Cadillac had a paper temporary tag. Agents attempted to get the license plates from the red Dodge and the blue pickup. At 1:22 pm, the Complainant, who was with CHS 1 at the time, notified TFO Dickie that **Catalan** and CHS 1 had talked and **Catalan** asked CHS 1 to delay his/her arrival at the shop for fifteen (15) to twenty (20) minutes. At 1:35 pm, a heavy set Hispanic male exited from the personnel door of the shop and walked to the driver's side of the black Cadillac. The Hispanic male entered the driver's seat and left the shop. The vehicle traveled northeast on Forest Avenue to Parnell Street and headed northwest. The Cadillac turned northeast on South Boulevard before going out of sight of the surveillance units. At 1:42 pm, the Cadillac returned to the shop and parked next to the blue pickup. The same Hispanic male exited the Cadillac and carried a blue colored box and a black sack into the personnel door of the shop. At 1:45 pm, CHS 1 received a call from **Catalan,** who asked CHS 1 to wait an additional five (5) minutes before heading to the shop.
At about the time CHS 1 received this call, the Complainant heard the broadcast over the radio that a Toyota pickup truck and a Chevy Avalanche had arrived at the shop. Surveillance units observed a small black Toyota pickup arrived at the shop and parked in front of the bay door.

**Criminal Complaint – Page 9**

Shortly after the arrival of the small Toyota pickup, a black Chevrolet Avalanche (TX-DPG2914) arrived and parked between the red Dodge 4 door car and the street in front of the shop. Agent Dickie observed a Hispanic male, hereinafter referred to as **First Name Unknown Last Name Unknown (FNU LNU) 1**, exit the Avalanche and observed **FNU LNU 1** carrying a clear bag with a dark colored substance in the bag. The bag appeared to have a knot tied in the top of the bag. Agent Dickie observed several males talk near the front of the Toyota pickup before entering into the personnel door of the shop. At 1:56 pm, at approximately the same time that the Toyota and the Avalanche arrived at the shop, **Catalan** called CHS 1 and told CHS 1 that the drugs had arrived at the shop and CHS 1 should come to the shop. After remaining at the shop for a short period, both the Avalanche and the Toyota pickup left. The pickup headed southwest on Forest Avenue to Lamar Street. The Avalanche headed northeast on Forest and then north on Martin Luther King Boulevard. Surveillance units maintained watch on the shop. At 2:07 pm, CHS 1 arrived at the shop, parked in front of the shop and walked inside the shop after speaking with a Hispanic male around CHS 1's vehicle. At 2:11 pm, CHS 1 walked out to CHS 1's vehicle, opened the trunk of the vehicle and then returned to the shop. CHS was retrieving the buy money from the trunk. At 2:16 pm, CHS 1 walked out of the shop, entered his/her the vehicle, and left heading southwest on Forest Avenue. At 3:00 pm, the black Avalanche (DPG2914) arrived back at the shop and parked in front of the shop. **FNU LNU 1** exited the driver's door of the vehicle and a female, identified below as M.M., exited the passenger side of the vehicle. **FNU LNU 1** and M.M. walked to the blue pickup. **FNU LNU 1** got into the back driver's side seat and M.M. appeared to get into the passenger side front seat. After a short time in the blue pickup, both **FNU LNU 1** and M.M. from the Avalanche exited the blue pickup. **FNU LNU 1** and M.M. re-entered the Avalanche. At 3:03 pm, the black Avalanche departed the shop heading northeast on Forrest Avenue and then onto Martin Luther King Boulevard. Surveillance was maintained on the Avalanche and surveillance units noted that the vehicle was traveling noticeably slower than most other traffic on the roadways. At 3:19 pm, the Avalanche arrived at the Walgreens located at 2060 South Buckner, Dallas, Texas. The Avalanche parked in the parking lot to the west of the building and both **FNU LNU 1** and M.M. entered the Walgreens. Agent Gary Koenig took photographs of **FNU LNU 1** and M.M. as they exited the Walgreens. At 3:32 pm, **FNU LNU 1** and M.M. walked back to the Avalanche and reentered the Avalanche. The vehicle departed the Walgreens and headed west on Bruton Road. At 3:37 pm, the Avalanche arrived at XXXX Colebrook Drive. Both **FNU LNU 1** and M.M. exited the Avalanche and walked to the residence. The registered owner of the Chevrolet Avalanche was identified as Gustavo Martinez with an address of XXXX Gaylord Drive, Dallas, Texas 75217.

25.     On January 29, 2015, CHS 1provided the details of the controlled buy of the kilogram of Ice from **Catalan**. CHS 1 reported that when he/she arrived at **Catalan**'s shop, **Catalan** got out of the rear door of a truck which was parked in front of the shop.

**Catalan** approached CHS 1's vehicle and walked around the vehicle as though he was inspecting the vehicle. **Catalan** told CHS 1 to leave the car outside and lock it. **Catalan** and CHS 1 then entered the shop. CHS 1 saw **Catalan's** red Infiniti parked in the rear left inside the shop. **Catalan** told CHS 1 that they were working on the Infiniti because the air conditioning compressor broke the last time he went to Mexico. CHS 1 described a cabinet with a drawer in the middle of the shop. CHS 1 also described a metal barrel without a lid near the cabinet. **Catalan** grabbed a piece of plywood and laid it on the top of the barrel. **Catalan** then placed a scale on the plywood. **Catalan** retrieved a box from the cabinet. The drugs were in a gallon sized zip lock plastic bag inside a blue Bud Light twelve pack box. The Bud Light box was in a white plastic grocery bag and a black plastic grocery bag. When they weighed the drugs and the zip lock bag, CHS 1 recalled them weighing 1.09 kilograms. CHS 1 observed four (4) big pieces of crystal meth and smaller broken pieces. **Catalan** told CHS 1 that he/she was paying more because of the quality of the meth. **Catalan** also told CHS 1 that when the meth arrived from Mexico, it was not ready to be sold. **Catalan** told CHS 1 that the meth arrives in a paste form and is then cooked into crystal once it arrives in the US. When questioned by CHS 1, **Catalan** told CHS 1 that this meth came from the same supplier as the meth the CHS had last purchased. Once the drugs were weighed and CHS 1 inspected them, CHS 1 took the package and put it in the trunk of his/her car. CHS 1 retrieved the buy money from the truck and took it to **Catalan** in the back seat of the truck. **Catalan** counted the bills in approximately five of the stacks and then just counted the remaining stacks. CHS 1 asked **Catalan** whether he would pay **Flores** for his part of this deal. **Catalan** told CHS 1 that he would take care of **Flores**. **Catalan** told CHS 1 that a shipment of cocaine should arrive this weekend or before Monday and the price per kilogram should be less than $31,000 per kilo. **Catalan** told CHS 1 that with the lower price per kilo of cocaine, they all could make money on the sales of the cocaine. CHS 1 stated that the old Hispanic male was in the shop when the deal occurred. When **Catalan** and CHS 1 were in the shop, CHS 1 noticed a shadow of someone coming into the shop. The older male had come from across the street. CHS 1 had heard that this older man was in the US because he had supposedly killed three people in Mexico. When **Catalan** took some of the old man's money when he went to Mexico, the old man supposedly told **Catalan** that he would be next unless he repaid the money he had taken. **Catalan** was supposedly repaying the man $50 to $100 at a time for the $8,000 he took. **Catalan** left the buy money in the truck when CHS 1 left. **Flores** told CHS 1 that he was paying **Catalan** $1,100 for an ounce of cocaine. **Flores** told CHS 1 that FG at the other shop was selling an ounce of cocaine for $900 or $950.

26.     On January 29, 2015, the Complainant and SA Tim Smylie transported the one kilogram of Ice purchased in the controlled buy from **Catalan** to the Dallas FBI Evidence Control Room. SA Smylie took nine photographs of the evidence and the box and bags in which the drugs were contained.

**Criminal Complaint – Page 11**

The photographs also depict the positive field test and the weighing and packaging of the drugs. SA Smylie conducted a field test, which showed a positive result for the presence of Ice. The drugs were contained in a gallon sized plastic zip lock bag. The drugs and the zip lock bag were in a white plastic grocery bag which was inside a black plastic grocery bag. The drugs, the zip lock bag, the white grocery bag and the black grocery bag were in a Bug Light 8 ounce twelve pack box. The drugs and the plastic zip lock bag in which they were contained weighed 1009.2 grams. Once the zip lock bag and the drugs were placed into the k-pac evidence bags and sealed with the DEA evidence sticker, the total package weight was 1039.4 grams. The drugs and the zip lock bag were designated 1B17. The packaging was designated 1B18.

27.    On January 29, 2015, based on the surveillance described above, investigators believe that the Ice was brought to **Catalan**'s shop by an unknown male and an unknown female driving a black Chevrolet Avalanche bearing Texas tags DPG2914. Based on a comparison of driver's license photographs to the surveillance photographs, the unknown female has been identified as M.M., DOB XX/XX/1995, SSN XXX-XX-2842, DL 39000292, address XXXX Colebrook Drive, Dallas, Texas. Investigators are continuing their attempts to identify the unknown male driver, **FNU LNU 1**.

28.    On February 5, 2015, CHS 1 met with **Flores** to receive a sample of cocaine.  At 2:08 pm, CHS 1 arrived at the Chevron gas station, located on the southwest corner of Marsalis and I-35 E. At 2:15 pm, the tan Kia Sorrento, Texas license DRT4226, known to be driven by **Flores**, arrived at the gas station. At 2:16 pm, the Kia departed the gas station, followed by CHS 1. At 2:21 pm, the Kia and CHS 1 pulled into parking spots in front of Mariscos La Reyna restaurant, 517 Jefferson, Dallas, Texas. **Flores** exited the Kia and a Hispanic female departed, driving the Kia. **Flores** and CHS 1 entered the restaurant. At 3:38 pm, CHS 1 and **Flores** exited the restaurant. **Flores** went to the passenger side of the Kia, which had returned to the restaurant. **Flores** then walked around the front of the Kia and approached the passenger window of CHS 1's vehicle. **Flores** appeared to talk briefly to CHS 1.  **Flores** then got into the front driver door of the Kia, after the female climbed over the center console.  At 3:39 pm, the Kia and CHS 1's vehicle back out of their parking spaces and traveled west on Jefferson. CHS 1 called the Complainant and reported that **Flores** wanted CHS 1 to follow him to his trailer in Kaufman, Texas to get a sample of cocaine.  At 4:07 pm, both vehicles exited the first exit south of I-20 off of I-45, the Dowdy-Ferry exit.  Both vehicles turned west on Palestine and south on Main. At 4:09 pm, the vehicles entered the Quail Run trailer park, 903 S. Main, Kaufman, Texas. SA Edward Quintana observed the Kia and CHS 1's vehicle parked in front of trailer XX and observed CHS 1 entering the trailer. At 4:15 pm, CHS 1's vehicle and the Kia were observed departing the trailer park. Both vehicles traveled north on Main and east on Palestine.

29.    On February 5, 2015, CHS 1 traveled to meet with the Complainant and SA Tim Smylie. The Kia entered I-45 northbound. CHS 1 provided the Complainant with two small red tinted zip lock baggies which each contained a white powdery substance. CHS 1 had received the two small red tinted zip lock baggies from **Flores** at the trailer.

30.    On February 5, 2015, CHS 1 stated that when he/she and **Flores** arrived at **Flores**'s trailer, **Flores** told him/her that he had just talked to FG. FG told **Flores** that he would be willing to allow **Flores** to take CHS 1 to meet one of FG's cocaine suppliers, who lived in west of Dallas, EM. FG told **Flores** that **Flores** could take CHS 1 to meet EM at EM's house on Monday, February 9, 2015 at two or three in the afternoon. CHS 1 and **Flores** tentatively agreed to meet at the Shell station at I-45 and Illinois. FG also told **Flores** that they would give CHS 1 a sample of the supplier's cocaine on Monday. In an effort to vouch for CHS 1, **Flores** had supposedly told FG that CHS 1 had been buying kilograms of Ice from **Catalan** and there had not been any problems. Based on what **Flores** had said, CHS 1 believed that **Catalan** knew EM and occasionally would get cocaine from EM. **Flores** told CHS 1 that **Catalan** would charge CHS 1 $31,500 for a kilogram of cocaine. The cocaine would not be from EM.

31.    On February 5, 2015, the Complainant and SA Smylie met with CHS 1 and retrieved the two small red tinted zip lock baggies which each contained a white powdery substance. The Complainant transported the drug samples to the Evidence Control Room at the Dallas FBI office. SA Jeff Ramirez assisted the Complainant in weighing, testing and packaging the evidence. The Complainant took three photographs of the samples and field tested the white powdery substance from one of the two baggies. The sample tested positive for the presence of cocaine. This evidence was designated evidence item 1B 19.

32.    On February 9, 2015, CHS 1 met **Flores** and FG and received two samples of cocaine, one from **Flores,** which **Flores** said came from **Catalan,** and one from FG. After initially meeting **Flores**, **Flores** directed CHS 1 to a house at of XXX Woodlawn, Dallas, Texas. At 2:34 pm, CHS 1 and **Flores** were observed meeting with FG. After the meeting, at 3:02 pm, CHS 1 met with the investigators. CHS 1 provided the Complainant with two cocaine samples he/she had received from **Flores** and FG. CHS 1 had received a small red tinted zip lock baggie. The red baggie contained a compressed white powdery substance. **Flores** told CHS 1 that this sample of cocaine came from **Catalan**. **Flores** claimed that the cocaine was good quality. CHS 1 had received a small clear zip lock baggie which contained a compressed white powdery substance from FG. That sample supposedly came from EM.

33.     On Saturday, March 28, 2015, CHS 1 obtained a sample of Ice from **Flores**, which **Flores** supposedly obtained from a new supplier. The supplier was supposedly from Mexico. **Flores** told CHS 1 that if he/she did a deal with the new supplier, they could do the deal at **Catalan's** shop. At 12:30 pm, CHS 1 met with the investigators. At 12:32 pm,  CHS 1 departed the meeting location, followed by the investigators. At 12:47 pm, CHS 1 arrived at the Shell gas station at I-45 and Illinois. The Complainant observed **Flores'** white Toyota Avalon parked at the northwest pump in the lot. TFO Dickie pulled into the gas station and pumped gas to observe the activity. At 12:55 pm,  CHS 1 departed the gas station followed by the Complainant and SA Smylie. At 1:55 pm, CHS 1 and the investigators arrived at the pre-arranged meeting location. CHS 1 provided the Complainant with the sample of Ice provided to him/her by **Flores**.

34.     On Saturday, March 28, 2015, CHS 1 provided the details of the meeting with **Flores**. CHS 1 reported that when he/she pulled into the gas station, **Flores** was talking to a young Hispanic male, who was standing at the window of **Flores's** car. When CHS 1 walked up to the car, the Hispanic male walked into the store. CHS 1 got into the back seat of **Flores's** car. **Flores's** wife was with him in the car. **Flores** retrieved a quart sized freezer bag which contained drugs packaged in various sized packages. CHS 1 estimated that the packages ranged in weights from two ounces to eight balls. **Flores** handed CHS 1 a small baggie containing a sample. **Flores** told CHS 1 that the new suppliers are a brother and a sister. The sister sells the Ice for her brother. They supposedly have a lot of Ice available right now. **Flores** told CHS 1 to call him a day ahead so that they could prepare the kilogram of Ice, which would sell for $14,000. **Flores** told CHS 1 that FG also deals with the sister. The brother and sister supposedly live in the area of the gas station. CHS 1 told **Flores** that he/she would let him now next week about a purchase.

35.     On Saturday, March 28, 2015, after receiving the sample of Ice, the Complainant transported the sample to the Dallas FBI Evidence room. The sample was in a small plastic zip lock baggie. The Complainant and SA Tim Smylie field tested the drugs. The test showed a positive result for the presence of Ice. The drugs and packaging material from the sample were determined to weigh 0.6 grams. Once the drugs and packaging were placed into a heat sealed kpac evidence bag with the appropriate label, the total package weight was determined to be 30.8 grams. This evidence of sample of cocaine and packaging was designated evidence number 1B 27. All items of evidence were then placed into the temporary overnight vault at the Dallas FBI Evidence Room.

36.     On April 9, 2015, CHS 1 met **Catalan** to obtain a sample of cocaine and later met **Flores** and one of **Flores's** Ice suppliers,  At 1:47 pm, the Complainant and SA Smylie met with CHS 1. CHS 1 placed a call to **Catalan** to ensure that he would be at his shop and to let him know that CHS 1 would be there in about fifteen minutes.

CHS 1 stated that after he/she meets with **Catalan**, he/she will be following **Flores** to meet a new Ice supplier.  CHS 1 reported that **Flores** told him/her that **Catalan** has **Flores** wire money, thousands of dollars, once or twice weekly to **Catalan**'s people in Mexico.  **Catalan** uses **Flores** to send the money so that he does not get "burnt" for sending the money.  **Catalan** pays **Flores** a few hundred dollars for each $1,000 he sends.  **Catalan**'s red Infiniti SUV, a green Dodge Stratus, Texas license JZ7235, and a black Lincoln, were observed at the shop.  At 2:11 pm, CHS 1 arrived at **Catalan**'s Shop, 1209 Forest, Dallas, Texas.  CHS 1 parked in front of the main bay door of the shop.  CHS 1 exited his/her vehicle and walked into the shop.  At 2:28 pm, **Flores'** white Toyota Avalon pulled into the area in front of **Catalan's** shop and then pulled out of the lot and pulled into the lot to the south of **Catalan's** shop.  **Flores** was observed exiting the Avalon and entering **Catalan's** shop.  A second occupant was observed in the front passenger seat of the Avalon.  At 2:32 pm, CHS 1 and **Flores** were observed talking outside of the shop.  CHS 1 and **Flores** moved to their vehicles.  At 2:33 pm, CHS 1 and the Avalon backed out of their parking spots and onto Forest and CHS 1 followed the Avalon east on Lamar.  At 2:38 pm, the Avalon and CHS 1 arrived at the La Esquina club, 5328 S. Lamar, Dallas, Texas.  Both the Avalon and CHS 1's vehicles pulled into the lot facing the building.  **Flores** exited the Avalon and entered CHS 1's vehicle.  At 2:59 pm, a tan Mazda, bearing temporary paper plate 84N0247, pulled to the passenger side of the Avalon.  CHS 1 and **Flores** moved to the driver window of the Mazda and appeared to be talking to the driver of the Mazda.  At 3:06 pm, the Mazda departed the La Esquina club and traveled north on Lamar to Alligator Jack's Store 5214 S. Lamar, Dallas, Texas.  At 3:07 pm, CHS 1 and the Avalon departed the La Esquina club and proceed north on Lamar.  The Mazda also departed the store and proceeded north on Lamar.

37.     On April 9, 2015, the Complainant followed CHS 1 to a pre-determined meeting location, where CHS 1 provided the Complainant with a sample of cocaine, wrapped in a paper pharmacist's fold.  CHS 1 provided the details of the meeting with Catalan.  When CHS 1 entered **Catalan's** shop, **Catalan** and the old man, who works for **Catalan**, were in the shop.  **Catalan** then moved to a shelf near the back of the shop, where he removed a yellow can, which appeared as a paint can.  **Catalan** unscrewed the bottom of the can and pulled out a zip lock baggie which appeared to contain four ounces of cocaine (based on CHS 1's estimation).  The cocaine was in hard form and **Catalan** broke off a corner and provided it to CHS 1 in a paper bindle.  CHS 1 told **Catalan** that he/she would call him early next week to coordinate the purchase of a kilo of Ice.  **Catalan** told CHS 1 to call him a few days before so that his suppliers could have the Ice ready.  **Catalan** told CHS 1 that his cocaine supplier brought three kilos of cocaine to him the previous day.  The supplier told **Catalan** that he did not want to sell any amount smaller than three kilos at a time and he would not accept anything less than $31,000.  **Catalan** told CHS 1 that the cocaine was good and contained no cut.

CHS 1 told **Catalan** that he/she would wait to make a cocaine purchase until his/her customer came to town to meet **Catalan** and discuss future deals. **Catalan** told CHS 1 that the cocaine supplier would get rid of his supply of cocaine in a few days, but he would get more the following week. CHS 1 stated that **Catalan** got a call on the land line at the shop. After the phone call, **Catalan** sold an eight ball of cocaine for $170 to a grey car that pulled up in front of the shop. **Catalan** handed the cocaine in through the passenger window of the car. **Catalan** told CHS 1 that he would sell a kilo of Ice to CHS 1 the following week for $15,000, unless CHS 1 bought more than one kilo. CHS 1 stated that **Flores** pulled up in front of the shop and then pulled to the south of the shop. A heavy-set female was in the Avalon with **Flores**. CHS 1 followed **Flores** to the La Esquina bar. Later, a tan Mazda, with no front plate pulled up next to **Flores**'s Avalon. CHS 1 stated that the Mazda was occupied by two young Hispanic males in their twenties. The two occupants of the Mazda told CHS 1 that he/she would like the quality of their Ice. The driver told CHS 1 that he would sell a kilo of Ice for $13,000. The driver also said that the price for the kilo could go lower on the day of the deal. **Flores** told the two that CHS 1 was "for real" and had done kilo Ice and cocaine deals. The driver told CHS 1 that he/she would get better quality Ice if he/she buys a kilo because it would not be cut, like smaller amounts. **Flores** told CHS 1 that he will buy an ounce of Ice from the two this weekend and he will save CHS 1 a sample. **Flores** told CHS 1 that the driver quickly buys and sells the cars he uses to do his deals. The driver also supposedly has a few trap houses in the area of the La Esquina. **Flores** has been to the houses to make purchases. When asked whether it would seem strange for CHS 1 to buy a kilo of Ice from **Catalan** for $15,000 when the two offered a kilo of Ice for $13,000, CHS 1 replied that he/she told **Flores** that he/she was a man of his word and he/she had told **Catalan** he would make a purchase. CHS 1 told **Flores** that because of his/her relationship with **Catalan**, he/she was willing to absorb the higher price.

38.     On April 9, 2015, the Complainant transported a sample of cocaine obtained by CHS 1 from **Catalan** to the Dallas Evidence Control Room. SA Tim Smylie met the Complainant at the evidence room and witnessed the packaging of the sample. SA Smylie conducted a field test of the cocaine, which tested positive for the presence of cocaine. The evidence, including the baggie and the drugs weighed a total of 0.02 grams. Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 34.0 grams. The drug evidence was designated 1B 30. SA Smylie took six photographs of the evidence and the packaging of the evidence.

39.     On April 13, 2015, CHS 1 met Flores to obtain a sample of Ice. At 1:10 pm the Complainant and SA Smylie met CHS 1 at a pre-arranged location. CHS 1 was scheduled to meet **Flores** to pick up a sample of Ice purchased by **Flores** from the suppliers the CHS met on April 9, 2015 at La Esquina club.

*Criminal Complaint – Page 16*

TFO Dickie met with a Texas DPS trooper to coordinate the stop of **Flores** in an attempt to positively identify him. At 1:20 pm, CHS 1 departed the meeting location followed by the Complainant and SA Smylie. At 1:31 pm, the Complainant observed the white Toyota Avalon, known to be driven by **Flores**, parked along the chain link fence at the west end of the Chevron gas station at Overton and I-45. CHS 1 exited I-45 and entered the Chevron parking lot. CHS 1 moved to **Flores'** car and entered the back seat. At 1:35 pm, the Avalon departed the gas station, traveled east on Overton and south on SM Wright. CHS 1 departed the gas station after the Avalon and was followed by the Complainant to a meeting location.

40.    On April 13, 2015, the Complainant met with CHS 1, who provided the Complainant with a small plastic zip lock baggie containing the sample of crystal meth. The Complainant secured the baggie as evidence. The Complainant transported this and two other drug samples to the Dallas FBI evidence room. The Complainant was met by SA Tim Smylie. SA Smylie tested each sample and took photographs of the packaging. The Ice sample CHS 1 received from Flores was in a small plastic zip lock baggie. SA Smylie tested the drugs and the test was positive for the presence of methamphetamine. The baggie weighed .02 grams. Once the baggie was packaged in the heat sealed kpac bag with the appropriate evidence label, the package weighed 32.4 grams. This sample was designated evidence number 1B 31.

41.    On April 22, 2015, CHS 1 made a controlled purchase of a kilogram of Ice from **Catalan** for $15,000. At 12:05 pm, CHS 1 called the Complainant and reported that he/she had just talked to **Catalan**. **Catalan** told CHS 1 that the kilo of Ice was not at the shop yet. **Catalan** told CHS 1 that the drugs would be there within an hour or so. In response to this information from **Catalan**, CHS 1 called **Flores** to find out what the problem was with **Catalan**. CHS 1 told **Flores** to go to the shop so that they could get the deal done. **Flores** told CHS 1 that he was on his way to the shop and he would see what was happening. At 12:30 pm, **Flores'** white Toyota Avalon arrived at **Catalan's** shop. There were two other cars also at the shop. At 1:01 pm, the Complainant and SA Smylie met with CHS 1 at a pre-arranged location. FG told CHS 1 that he had talked to **Catalan** and knew that **Catalan** had not supplied CHS 1 with a kilo of Ice as agreed on Friday, 04/17/2015. At 1:12 pm, CHS 1 place a call to **Catalan**. **Catalan** told CHS 1 that the kilo of methamphetamine was on the way to his shop. CHS 1 placed the buy money in the trunk of his vehicle. At 1:25 pm, CHS 1 departed the meeting location, followed by the Complainant and Smylie. At 1:42 pm, CHS 1 arrived at **Catalan's** shop. CHS 1 pulled his/her vehicle into the shop. At 1:43 pm, CHS 1 and **Catalan** were observed meeting and talking. At 1:46 pm, **Flores** arrived at the shop in his white Toyota Avalon. At 2:04 pm, a silver two door Chevy Cavalier, Texas license BMZ7944, arrived at the shop. The driver, an older black male, got out of the car and talked to **Catalan** while looking at the exterior of the Cavalier.

Criminal Complaint – Page 17

At 2:07 pm, **Catalan** and the black male entered the shop. At 2:09 pm, the black male exited the shop, got into the Cavalier and departed the shop, north on Forest. At 2:26 pm CHS 1 entered the shop. The Avalon departed with **Flores** driving. At 2:35 pm, the Avalon was observed at the Good Luck restaurant, east on Lamar from **Catalan**'s shop. At 2:48 pm, the Avalon arrived back at **Catalan**'s shop and parked to the south of the shop. A black 4 door Chevy, possibly a Malibu or an Impala, also parked to the south of **Catalan**'s shop. No one exited the car. At 2:49 pm, the black Chevy departed the area of **Catalan**'s shop. **Flores** carried a case of beer into the shop. **Flores** returned to the Avalon and then carried a bag of ice into the shop. At 3:17 pm, a maroon Chrysler 300 pulled up in front of the shop and parked on the street facing south. The driver, a young black male, exited the car and met with **Catalan**. The two walked around the car. At 3:23 pm, the black male and **Catalan** entered the shop. At 3:24 pm, the black male exited the shop, entered the Chrysler and departed north on Forest. At 3:28 pm, **Flores** moved to the Avalon and entered the car. At 3:29 pm, the Avalon slowly circled the block around **Catalan**'s shop, traveling west on Lamar, north on South, east on Parnell, where the Avalon hesitated near the intersection of Parnell and Forest. At 3:33 pm, a white single cab Ford Ranger, Texas license BS09002, arrived at **Catalan's** shop. The Avalon was in front of the shop when the truck arrived. The Ranger pulled into the bay of **Catalan**'s shop. CHS 1 was overheard on the transmitter reporting that the drugs were in the white truck. The Avalon slowly traveled west on Lamar, north on South, east on Gould and entered the Big D Cut Rate Beer and wine liquor store parking lot on the northwest corner of Forest and Gould. At 3:36 pm, the Ranger exited the shop, traveled west on Lamar, north on South, east on Parnell and north on Forest. The Ford pulled into the parking lot of a strip shopping center at Cleveland and Forest. At 3:37 pm, CHS 1's vehicle backed out of the bay at **Catalan's** shop and traveled west on Lamar, followed by the Complainant and SA Smylie. At 3:42 pm, the Ranger returned to **Catalan's** shop. At 3:43 pm, the Avalon returned to **Catalan's** shop. CHS 1 called the Complainant and reported that **Catalan** told the white truck to leave the shop for a short period of time. Once CHS 1 left the shop, the truck should return to the shop. At 3:51 pm, CHS 1 met with the Complainant and provided the Complainant with the kilogram of Ice, which was in a Bud Light cardboard box.

42.    On April 22, 2015, CHS 1 provided details of the controlled buy. CHS 1 reported that he/she had been talking to **Flores** on the way to meet with the investigators. **Flores** asked CHS 1 if he/she knew what **Catalan** had done. CHS 1 asked **Flores** what he meant. **Flores** told CHS 1 that when **Catalan** knew that the courier was ten minutes away from the shop, he sent **Flores** out to look for surveillance. **Flores** explained that by sending him away from the shop to look for surveillance, **Catalan** prevented **Flores** from seeing how much he paid for the kilogram of Ice. **Flores** told CHS 1 that when he got back to the shop, the white truck was already in the shop and **Catalan** had given the driver the money for the kilogram. **Catalan** did pay **Flores** for his part of the deal.

When CHS 1 asked why the delivery was taking so long, **Catalan** told CHS 1 that when he called the Source of Supply (SOS), the SOS told **Catalan** that he knew it was coming from far away.  When the drugs arrived, **Catalan** took a square digital scale out of a toolbox in the shop and weighed the package.  CHS 1 asked **Catalan** to set the scale for kilograms.  CHS 1 stated that the maroon Chrysler was at the shop looking to have the rear bumped repaired.  The driver of the grey Cavalier was also looking for repair work to the Cavalier.  While they were waiting for the drugs to arrive, **Catalan** was showing CHS 1 photos of girls and his large, new house in Mexico.  The house is supposedly thirty minutes from Michoacán.

43.    On April 22, 2015, CHS 1 provided the package containing the kilogram of Ice to the Complainant.  After receiving the Ice, the Complainant transported the drugs and packaging to the Dallas FBI Evidence room.  The Complainant was met at the evidence room by SA Tim Smylie.  The Ice was in a Bud Light 12 pack cardboard box for 12 ounce cans.  Inside of the Bud Light box was a white Wal-Mart plastic grocery bag.  In the Wal-Mart bag were two blue paper shop towels and a Hefty brand zip lock freezer bag, approximately the size of a gallon zip lock bag.  The zip lock bag contained a crystalline substance, believed to be Ice.  SA Smylie field tested the drugs.  The field test did show a positive result for the presence of Ice.  SA Smylie took nine photographs of the drugs, the packaging in which the drugs were contained and the evidence packaging.  The drugs, the white Wal-Mart bag, the two shop towels and the plastic zip lock bag were determined to weigh 1032.2 grams.  Once the drugs and packaging were placed into a heat sealed kpac evidence bag with the appropriate label, the total package weight was determined to be 1062.4 grams.  The evidence of the drugs, the zip lock bag, the white Wal-Mart bag and the two shop towels was designated as evidence number 1B34.  The Bud Light box was packaged separately and was designated as evidence number 1B35.

44.    On April 29, 2015, in anticipation of a meeting with **Flores** and other subjects, CHS 1 met with the Complainant.  1:48 pm, the Complainant met with CHS 1 at a pre-arranged location.  CHS 1 reported that **Flores** wanted to meet CHS 1 at a Shell gas station off of Peak Avenue in Dallas at 3:00 pm.  **Flores** told CHS 1 that the marijuana deal with the black male customer was delayed since the customer went to pick up his children.  At 1:56 pm, CHS 1 placed a call to **Flores**.  **Flores** asked CHS 1 to meet him at Sapito's restaurant near I-30 and Peak in Dallas.  CHS 1 conducted other meetings prior to meeting **Flores**.  At 3:05 pm, CHS 1 called the Complainant and reported that **Flores** called and asked CHS 1 to meet him at a restaurant.  CHS 1 told **Flores** that he/she was eating and he/she did not want to go to another restaurant.  **Flores** asked CHS 1 to meet him at Gers shop.  CHS 1 told the Complainant that he/she would end the meeting he/she was conducting.  CHS 1 reported that **Flores** had called and wanted to meet CHS 1 at a restaurant on Columbia Street.  CHS 1 told **Flores** that unless the female Ice supplier was with him, he/she would not meet **Flores**.

Criminal Complaint – Page 19

**Flores** told CHS 1 that he needed to pick up something from FG at Gers shop and to meet his at Gers shop. At 3:17 pm, the CHS again met with the investigators. At 3:19 pm, CHS 1 departed the meeting location followed by the investigators. At 3:33 pm, CHS 1 called the Complainant and reported that **Flores** was supposedly en route to pick up the black male customer so that he and FG could do another deal with the customer. **Flores** told CHS 1 that he would back at the shop in 25 to 30 minutes. At 3:50 pm, **Flores**, in his white Toyota Avalon, was observed traveling west on 8th, past the shop. The Complainant followed **Flores**. At Denver, **Flores** turned south, looped around and then travelled east on 8th. At 3:56 pm, Flores arrived at Gers shop. At 4:13 pm, CHS 1 and **Flores** were observed out of the shop and at their cars. CHS 1 called the Complainant and reported that **Flores** and FG were going to pick up marijuana and go to the black male customer's house. At 4:17 pm, Flores entered the driver front of his Toyota and CHS 1 entered the front passenger side of **Flores'** Toyota. At 4:20 pm, CHS 1 exited the Toyota. At 4:21 pm, CHS 1 departed Gers shop. At 4:34 pm, CHS 1 met with the Complainant and TFO Dickie. CHS 1 provided the Complainant with a small green tinted zip lock baggie which contained methamphetamine from the two male Ice suppliers who CHS 1 met at La Esquina bar parking lot.

45.    On April 29, 2015, CHS 1 provided information regarding the meeting with **Flores**. CHS 1 stated that **Flores** pulled a white sock from between his car seat and the center console. CHS 1 estimated that the sock contained three ounces and ten medium sized zip lock baggies of Ice. **Flores** told CHS 1 that the west Dallas cocaine supplier, EM had 300 pounds of marijuana for sale. EM supposedly bought an $800,000 house in Forney, Texas. EM also supposedly has a number of low rider show cars. EM operated four stash houses, where he stores his drugs and from which he sells the drugs. One of the stash houses is the house on Winnetka, where **Flores** took CHS 1 during CHS 1's first attempt to buy a kilo of cocaine from **Flores** and FG. **Flores** told CHS 1 that the marijuana supplier had 12 kilograms of cocaine and now had 11 kilograms left. The Ice sample that FG gave to CHS 1 which was wrapped in the paper napkin came from this supplier. The marijuana supplier's marijuana comes in 22 pound blocks. He drops blocks of marijuana at FG's house. **Flores** and FG then sell the marijuana to their black male customer either at the customer's house or at Gers shop. FG was at the shop when the marijuana supplier dropped off a load of marijuana. When CHS 1 was with FG and **Flores** at Gers shop, **Flores** told FG, "Let's go." FG told **Flores** to go and get the money from their marijuana customer and bring it to the shop. **Flores** left the shop.

46.    On April 29, 2015, the Complainant transported a sample of crystal methamphetamine obtained by CHS 1 from **Flores** to the Dallas Evidence Control Room. TFO Dickie met the Complainant at the evidence room and witnessed the packaging of the sample. TFO Dickie conducted a field test of the sample of methamphetamine, which tested positive for the presence of methamphetamine.

**Criminal Complaint – Page 20**

The evidence, including the baggie and the drugs weighed a total of .06 grams. Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 30.6 grams. The drug evidence was designated 1B 38. The Complainant took three photographs of the evidence and the packaging of the evidence. Due to the late hour, the Complainant then placed the evidence into the temporary overnight storage locker.

47.   On May 28, 2015 in anticipation of a meeting with **Catalan** to receive a sample of cocaine, CHS 1 met with the investigators. At 4:00 pm, CHS 1 met with the investigators. At 4:08 pm, CHS 1 departed the meeting location followed by the Complainant and SA Smylie and TFO Dickie. At 4:21 pm, CHS 1 arrived at **Catalan's** shop, 1209 Forest Ave., Dallas, Texas. At 4:37 pm, CHS 1 departed the shop. At 4:45 pm, CHS 1 met with the Complainant, SA Smylie and TFO Dickie. CHS 1 provided the Complainant with a sample of cocaine provided to him/her by **Catalan**.

48.   On May 28, 2015, CHS 1 provided details of the meeting with **Catalan**. CHS 1 reported that a supplier visited **Catalan's** shop today. **Catalan** told CHS 1 that the supplier had fifteen (15) kilograms of cocaine available for $30,000 a kilogram. **Catalan** told CHS 1 that a different supplier has kilograms of cocaine available for $25,000. **Catalan** told CHS 1 that the lower priced cocaine is good to snort but not good to cook into crack. The sample which **Catalan** provided to CHS 1 came from the cocaine priced at $25,000 per kilogram. **Catalan** told CHS 1 that the color of the cocaine looked good. **Catalan** retrieved the cocaine from a spray can with a false bottom. The spray can was on a shelf located across from the office in the shop. **Catalan** told CHS 1 that the lowest price he could get for a kilogram of Ice was $14,500. That price was from the supplier who provided the Ice from which **Catalan** gave CHS 1 a sample. **Catalan** asked CHS 1 to let him know when the UCE would be coming and he would be willing to meet him. CHS 1 told **Catalan** that the UCE would be here on Sunday, May 31, 2015, and Monday, June 1, 2015. **Catalan** asked when the UCE would be ready to make a purchase. CHS 1 told **Catalan** that he and the UCE could talk about that in person. CHS 1 reported that the old man was in **Catalan's** shop. CHS 1 observed three cars in the shop and a number of cars in back of the shop. **Catalan** told CHS 1 that the cocaine sample he provided to CHS 1 came from a kilogram **Catalan** sold last Thursday.

49.   On May 31, 2015, CHS 1 and UCE 4532 obtained a sample of cocaine from **Catalan**. At 3:00 pm, the Complainant, SA Smylie and UCE 4532 met with CHS 1 at a pre-arranged location. At 3:30 pm, CHS 1 and UCE 4532 departed the meeting location, followed by the Complainant and SA Smylie. At 4:12 pm, CHS 1 and the UCE arrived at **Catalan's** Shop, 1209 Forest, Dallas, Texas. At 4:13 pm, CHS 1 and the UCE exited CHS 1's vehicle. At 4:15 pm, CHS 1 and UCE 4532 were observed talking to **Catalan** in the parking lot of the shop. At 4:18 pm, the UCE and **Catalan** were overheard exchanging phone numbers.

Criminal Complaint – Page 21

At 4:27 pm, the UCE and **Catalan** were observed talking outside the shop. A red Pontiac bearing Texas license DGR4145 was parked in front of the shop. A black Chevrolet Impala, no license observed, was also parked in front of the shop. At 4:41 pm, CHS 1, the UCE and **Catalan** entered the shop. At 4:45 pm, a fourth individual was observed at the shop. The individual was wearing a white button down shirt, slacks and a ball cap. The individual pulled a chair up outside of the shop. At 4:47 pm, **Catalan** was observed pointing north along Forest. At 4:49 pm, CHS 1 entered the shop. The UCE and **Catalan** shook hands. At 4:59 pm, CHS 1 and the UCE entered CHS 1's vehicle and departed the shop. At 5:15 pm, CHS 1 and UCE met with the Complainant, SA Smylie and TFO Dickie at a pre-arranged location. The UCE provided the cocaine sample from Catalan to the Complainant.

50.     On May 31, 2015, CHS 1 and UCE 4532 provided details of their meeting with Catalan. When the UCE and CHS 1 walked into the shop, they were greeted by **Catalan**. **Catalan** immediately began discussing drugs. **Catalan** offered the UCE kilograms of cocaine for $30,000. **Catalan** told the UCE that he could pick up the cocaine at the shop. **Catalan** told the UCE that they could negotiate a better price after the first purchase by the UCE. **Catalan** also told the UCE that he would get a better price if he purchased five or more kilograms. **Catalan** told the UCE that he also has both kilograms of crystal methamphetamine or Ice and cocaine available for sale to the UCE that day. **Catalan** quoted a price for a kilogram of meth as $14,500. The UCE told **Catalan** that he normally bought and sold in pound quantities, not kilogram quantities. **Catalan** told the UCE that they could negotiate the price if the UCE bought in large kilogram quantities. **Catalan** told the UCE that the deal would occur at his shop and he would have to first see the money for the buy. Once he saw the money, he would then have his people bring the drugs to the shop. **Catalan** told the UCE that he would be willing to close his shop on the day of the deal so that one of his black customers did not interrupt them. **Catalan** also offered to allow the UCE to pull his vehicle into the shop through a gate in the rear of the shop. Once the vehicle was inside the shop, they would load the drugs into the truck. **Catalan** told the UCE about a past deal with three black male customers, where the customers tried to rob him. An associate of **Catalan** shot at the robbers. **Catalan** showed the UCE bullet holes in the shop walls and told the UCE that one of the customers was shot and his partner had to pull him out of the shop. **Catalan** told the UCE that the police were not called because of the robbery and the shooting. **Catalan** told the UCE that they could renegotiate the price of both the meth and the cocaine after an initial purchase. **Catalan** told the UCE that he could do a deal for either drug that night or the next day. The UCE told **Catalan** that since he came to Dallas on a plane, he was not prepared to do a deal on this trip. The UCE and **Catalan** discussed whether **Catalan** could deliver the drugs to Denver. **Catalan** told the UCE that he did not have any transportation to move the drugs. The UCE told **Catalan** that he was assuming a large risk moving the drugs from Texas to Colorado.

The UCE and **Catalan** exchanged cell phone numbers and discussed **Catalan**'s long history of criminal activities. **Catalan** told the UCE that he was ready to do a deal with the UCE. **Catalan** provided the UCE with a small sample of cocaine, which he retrieved from a false spray paint can which contained what appeared to be an ounce of cocaine. Because the UCE did not have anything in which to put the sample, he wrapped the cocaine sample in a one hundred dollar bill. The UCE later provided the sample to the Complainant. **Catalan** told the UCE that the cocaine in the sample was for street level consumption, not for cooking into crack. **Catalan** quoted a price for a kilogram of cocaine of that quality as $25,000. **Catalan** told the UCE that the kilogram of the higher quality cocaine, which could be cooked into crack, was $30,000. The UCE, **Catalan** and **Catalan's** worker, an older Hispanic male, discussed the highways that the UCE should use to depart the area of **Catalan**'s shop. **Catalan** told the UCE that if he called to arrange a purchase to use the code that he had a car which needed to be repaired. **Catalan** also told the UCE not to use his name on the phone call. The UCE and **Catalan** discussed that they would do the deal in the morning to allow the UCE to move the drugs out of Texas. **Catalan** told the UCE that he had been doing business in Texas since 1998. Prior to coming to Texas, **Catalan** claimed that he worked selling drugs in Washington, D.C. since 1982. **Catalan** told the UCE that he has four young daughters at home. **Catalan** told the UCE that after he saw the purchase money, he would call someone to bring the drugs. The UCE could park his vehicle in the shop. Once the drugs arrived, they would load the drugs into the vehicle. Once the money count was verified, the UCE could leave the shop.

51.     On May 31, 2015, UCE-4532 received a sample of cocaine from **Catalan**. **Catalan** pinched a small sample of cocaine from a larger amount of cocaine and handed the sample to the UCE. The UCE, who did not have anything in which to package the sample, folded the sample into a one hundred dollar bill he had with him. When the Complainant met with the UCE, the UCE showed the Complainant the cocaine wrapped in the bill. The Complainant photographed the cocaine in the bill. The cocaine was then placed into a plastic baggie that the Complainant had with him. The Complainant took custody of the sample from the UCE. The Complainant transported the sample of suspected cocaine to the Dallas FBI Evidence Control Room. The Complainant and TFO Dickie took the attached photographs of the evidence. TFO Dickie conducted field tests of the sample, which showed a positive result for the presence of cocaine. The cocaine and the baggie weighed 3.2 grams. Once the cocaine and plastic baggie were placed into the k-pac evidence bag and sealed with the DEA evidence sticker, the total package weight was 18.4 grams. The cocaine sample was designated 1B 44.

52.     On July 1, 2015, CHS 1 met **Catalan** to pick up a sample of Ice. At 2:00 pm, CHS 1 met with the Complainant and SA Smylie at a pre-determined location. At 2:15 pm, CHS 1 departed the meeting location followed by the Complainant.

At 2:34 pm, CHS 1 arrived at **Catalan's** shop, 1209 Forest, Dallas, Texas. At 2:35 pm, CHS 1 entered **Catalan's** shop. At 2:37 pm, **Catalan** exited the shop and walked to his wife's Lexus, which was parked in front of the shop. The CHS was also observed outside. At 3:17 pm, a white Cadillac four door, Texas license 164VCF, arrived at the shop. At 3:30 pm, CHS 1 departed the shop. The Complainant followed CHS 1 to a pre-arranged meeting location. SAs Smylie and Grant joined the meeting. CHS 1 reported that **Catalan** provided samples of cocaine, crystal meth and marijuana. The CHS turned these three samples over to the Complainant. The cocaine was in a clear small baggie and the marijuana was in clear plastic sandwich baggie. The crystal meth was wrapped in a small piece of blue shop towel.

53.     On July 1, 2015, CHS 1 provided details of the meeting with **Catalan**. CHS 1 reported that the driver of the white Cadillac, whose name CHS 1 believed to be Cecil, wanted to buy three ounces of heroin. **Catalan** did not have the heroin at the shop, but **Catalan** told the customer that he would have the drugs delivered later. CHS 1 thought that **Catalan** told the customer that he would have the heroin in an hour. The customer told **Catalan** that he would be back in an hour. **Catalan** told CHS 1 that he had just sold his last ounce of heroin for $1200. CHS 1 described two metal barrels located inside the shop between the personnel door and the overhead door. **Catalan** had CHS 1 stand in front of one of the doors, while his worker stood in front of the other door. **Catalan** had the two stand to block the view into the shop once he moved one of the barrels. There was a PVC pipe with a screw lid under the barrel that **Catalan** moved. **Catalan** un-screwed the lid and remove what CHS 1 estimated to be a half kilo of cocaine from the pipe. CHS 1 estimated that the pipe would hold a few kilos. **Catalan** then moved the cocaine into the office of the shop, where they checked out the cocaine. **Catalan** told CHS 1 that he had one kilo but he had sold two quantities of four ounces each to two separate black male customers. **Catalan** also told CHS 1 that he currently has fifty pounds of marijuana. **Catalan** asked CHS 1 not to tell Jose Flores that he had the marijuana. **Catalan** retrieved the Ice sample from his wife's car, which was parked in front of the shop. CHS 1 reported that the marijuana was stored in a gallon metal paint can. The can was three/quarters full of marijuana. **Catalan** quoted a price of $670 per pound of marijuana. **Catalan** told CHS 1 that he would sell an ounce of heroin for $1200. **Catalan** had kilos of the heroin, which was black tar, available for sale. When CHS 1 discussed the purchase of a kilo of Ice and an ounce of cocaine by the UCE, **Catalan** quoted a price of $14,500 for the kilo of Ice and $1,000 for the ounce of cocaine. **Catalan** told CHS 1 that he usually charged $1100 for an ounce of cocaine. CHS 1 and **Catalan** agreed that CHS 1 would call Sunday if the UCE would make the purchase on Monday, July 6, 2015. **Catalan** told CHS 1 that the last time that FG had come to his shop was one month ago. When FG came to **Catalan's** shop, FG asked **Catalan** whether CHS 1 had brought the UCE, described by FG as Cuban or Dominican, to his shop. **Catalan** told FG that CHS 1 had brought the UCE to the shop.

Criminal Complaint – Page 24

54.    On July 1, 2015, the Complainant transported samples of crystal methamphetamine, cocaine and marijuana obtained by CHS 1 from **Catalan** to the Dallas Evidence Control Room.  SA Tim Smylie met the Complainant at the evidence room and witnessed the packaging of the sample.  The marijuana sample was packaged in a zip lock plastic sandwich baggie, which contained green leafy buds believed to be marijuana. The cocaine sample was packaged in a fold over plastic sandwich baggie, which contained a white compacted powder substance believed to be cocaine.  The crystal methamphetamine sample was packaged in a plastic fold over sandwich baggie containing piece of blue shop towel.  The piece of shop towel contained a clear crystalline substance believed to be crystal methamphetamine.  SA Smylie conducted a field test of each of the three samples.  Both the cocaine and the methamphetamine tested positive for the presence of cocaine and methamphetamine, respectively.  The field test for the marijuana did not test positive for the presence of THC.  The marijuana evidence, including the baggie and the drugs weighed a total of 6.0 grams.  Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 35.6 grams. The drug evidence was designated 1B 48.  The cocaine evidence, including the baggie and the drugs weighed a total of 0.05 grams.  Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 32.2 grams.  The drug evidence was designated 1B 49.  The methamphetamine evidence, including the baggie and the drugs weighed a total of 1.8 grams.  Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 31.6 grams.  The drug evidence was designated 1B 50.  SA Smylie photographed the drugs and the packaging of the drugs.  The evidence was then released to the Dallas FBI Evidence Control Room personnel.

55.    On July 7, 2015, UCE 4532 and CHS 1 made a controlled purchase of one kilogram of crystal methamphetamine and one ounce of cocaine from **Catalan**.  At 1:45 pm, the Complainant provided the UCE with $14,500 for the kilogram of methamphetamine and $1,000 for the ounce of cocaine.  At 2:05 pm, the Complainant and SA Smylie met with the UCE and CHS at a pre-arranged location.  At 2:10 pm, CHS 1 placed a call to **Catalan**.  At 2:19 pm, the UCE and CHS 1 departed the meeting location, followed by the Complainant and SA Smylie.  At 2:32 pm, the UCE and CHS 1 arrived at **Catalan's** shop.  CHS 1 pulled his/her vehicle into the shop.  At 2:40 pm, CHS 1 texted the Complainant, reporting that the drugs were already at the shop.  At 2:42 pm, the UCE called and reported that **Catalan** was offering to sell him an ounce of heroin for $1,000.  The Complainant agreed for the UCE to use funds provided to him to make the purchase.  At 2:43 pm the UCE was observed exiting the shop and was observed talking on his/her phone.  At 2:44 pm, the UCE re-entered the shop.  A black pickup truck was observed pulling out of empty lot to the north of the shop.

*Criminal Complaint – Page 25*

At 2:46 pm, CHS 1 called the Complainant and reported that the heroin dealer was en route to the shop with two ounces of heroin. CHS 1 advised that the UCE had agreed to purchase one ounce and another customer would buy the second ounce. CHS 1 then reported that the heroin supplier had called and told Catalan that he could not get to Catalan's shop until 5:00 pm. The UCE then took the purchase money for the ounce of heroin back from Catalan. Catalan agreed to provide a sample of heroin to CHS 1 at a later time. At 2:52 pm, the UCE exited shop, walked to rear of Catalan's red Infinity SUV, and then returned to shop. At 2:59 pm, **Catalan** exited the shop and walked to the edge of the street. **Catalan** looked up and down the street. At 3:00 pm, CHS 1 backed his/her car out of the shop. At 3:01 pm, the UCE and CHS 1 departed shop. At 3:03 pm, **Catalan** closed the bay door to shop. At 3:08 pm, the Complainant and SAs Smylie and Grant meet with the UCE and CHS. At 3:15 pm, the Complainant took possession of the one kilogram of methamphetamine and one ounce of cocaine. A silver four door sedan, Texas license DLY6798, arrived at **Catalan**'s shop. Investigation revealed that the tag is registered to a 2014 silver Chevy four door, to Maria Alejandra Perez,5529 La Villita Dr., Edcouch, Texas. An unknown female exited the vehicle and knocked on the personnel/office door to the shop. After approximately 15-30 seconds, **Catalan** opened the door. Both **Catalan** and the unknown female entered the shop. Approximately 15-30 seconds later, the unknown female exited the shop carrying a white plastic bag, entered the silver Chevrolet, and departed the shop. The remaining investigators maintained surveillance of the Chevy sedan, but lost contact shortly thereafter.

56.     On July 7, 2015, UCE-4532 and CHS 1provided the details of the controlled buy of the kilogram of Ice and ounce of cocaine from **Catalan**. CHS 1 showed the UCE the barrel under which **Catalan** hides drugs. CHS 1 reported that there were now three barrels in that area, instead of the previous two. When CHS 1 and the UCE arrived at the shop, **Catalan** told them that the meth and the cocaine got to his shop the previous evening. After they were in the shop, CHS 1, UCE and **Catalan** went directly to the office of the shop. **Catalan** removed the bag with the Ice from the desk. **Catalan** also removed the cocaine from the desk. **Catalan** used a large scale to weigh the Ice. CHS 1 and the UCE recalled that the Ice weighed 1010 or 1015 grams. **Catalan** then used a smaller scale to weigh the cocaine. CHS 1 and the UCE recalled that the cocaine weighed 29 grams. **Catalan** offered to sell the UCE an ounce of heroin for $1100. Initially, the heroin supplier was supposed immediately to bring two ounces. Five minutes later, the heroin supplier called and said he would not be at **Catalan's** shop until 5:00 pm. The UCE then took back the money he had paid **Catalan** for the ounce of heroin. **Catalan** told CHS 1 and the UCE that Cecil, the Black male customer who CHS 1 had previously seen at **Catalan**'s shop, liked the heroin from **Catalan**. **Catalan** again told the story that Cecil had been selling heroin since he was 14 years old. **Catalan** described the heroin and black, pasty and good quality. **Catalan** also told CHS 1 and the UCE that his supplier currently had a large quantity of heroin available.

Catalan asked CHS 1 and the UCE not to tell FG or **Jose Flores** anything about their dealings. **Catalan** claimed that he does not share information about CHS 1 and the UCE with either man. The UCE told **Catalan** that he was going to shop around for the best price and best quality and **Catalan** told the UCE that he would attempt to get a better price for the UCE. The UCE told **Catalan** that he might place an order for five kilos of Ice, four kilos of cocaine and a kilo of heroin. **Catalan** told the UCE that of he purchased five or more kilos the price would go down. **Catalan** guaranteed the UCE that the drugs would be very good quality. **Catalan** told the UCE that if he made a large purchase, the drugs would be waiting for him at the shop. The UCE would pull into the shop to do the deal. Because the deal would involve a large amount of money, **Catalan** asked that the money be packaged in stacks. **Catalan** would not count all of the buy money, but he would count random stacks using a money counter. **Catalan** told the UCE that he had given CHS 1 a sample of the heroin. CHS 1 reminded **Catalan** that he had not given him/her a sample. **Catalan** told CHS 1 that he should have given him/her a sample.

57.     On July 7, 2015, the Complainant, SA Smylie, and SA Grant met with the UCE and CHS. The Complainant took possession of the one kilogram of Ice and one ounce of cocaine. While at **Catalan's** shop, CHS 1 showed the UCE the barrel under which **Catalan** hides drugs. CHS 1 reported that there were now three barrels in that area, instead of the previous two. When CHS 1 and the UCE arrived at the shop, **Catalan** told them that the Ice and the cocaine got to his shop the previous evening. After they were in the shop, CHS 1, UCE and **Catalan** went directly to the office of the shop. **Catalan** removed the bag with the Ice from the desk. **Catalan** also removed the cocaine from the desk. **Catalan** used a large scale to weigh the Ice. CHS 1 and the UCE recalled that the Ice weighed 1010 or 1015 grams. **Catalan** then used a smaller scale to weigh the cocaine. CHS 1 and the UCE recalled that the cocaine weighed 29 grams. **Catalan** offered to sell the UCE an ounce of heroin for $1100. Initially, the heroin supplier was supposed to immediately bring two ounces. Five minutes later, the heroin supplier called and said he would not be at **Catalan's** shop until 5:00 pm. The UCE then took back the money he had paid **Catalan** for the ounce of heroin. **Catalan** asked CHS 1 and the UCE not to tell FG or **Flores** anything about their dealings. **Catalan** claimed that he does not share information about CHS 1 and the UCE with either man. The UCE told **Catalan** that he was going to shop around for the best price and best quality and **Catalan** told the UCE that he would attempt to get a better price for the UCE. The UCE told **Catalan** that he might place an order for five kilos of Ice, four kilos of cocaine and a kilo of heroin. **Catalan** told the UCE that of he purchased five or more kilos the price would go down. **Catalan** guaranteed the UCE that the drugs would be very good quality. **Catalan** told the UCE that if he made a large purchase, the drugs would be waiting for him at the shop. The UCE would pull into the shop to do the deal. Because the deal would involve a large amount of money, **Catalan** asked that the money be packaged in stacks.

**Catalan** would not count all of the buy money, but he would count random stacks using a money counter. **Catalan** told the UCE that he had given CHS 1 a sample of the heroin. CHS 1 reminded **Catalan** that he had not given him/her a sample. **Catalan** told CHS 1 that he should have given him/her a sample.

58.     On July 7, 2015, the Complainant transported a kilogram of Ice and an ounce of cocaine obtained during a controlled buy by CHS 1 and UCE 4532 from **Catalan** to the Dallas Evidence Control Room. SA Tim Smylie met the Complainant at the evidence room and witnessed the packaging of the drugs. The crystal Ice was contained in a brown plastic Wal-Mart store bag. The Ice was packaged in a gallon sized plastic zip lock bag. The ounce of cocaine was packaged in a plastic fold over style  sandwich baggie, which contained a white compacted powder substance believed to be cocaine. SA Smylie conducted field tests of both drugs. Both the cocaine and the Ice tested positive for the presence of cocaine and Ice, respectively. The cocaine evidence, including the baggie and the drugs weighed a total of 30.0 grams. Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 60.8 grams. The drug evidence was designated 1B 53. The Ice evidence, including the Burger King and Fiesta bags and the drugs weighed a total of 1009.4 grams. Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 1039.4 grams. The drug evidence was designated 1B 54. SA Smylie photographed the drugs and the packaging of the drugs.

59.     On July 9, 2015, the Complainant transported drug exhibits 1B 53 and 1B 54 to the Dallas DEA Laboratory with a request for expedited examination since a UCE was involved in the transaction. By a DEA Laboratory report, dated July 27, 2015, drug exhibit 1B 53 was determined to contain Cocaine Hydrochloride, with a net weight of 27.9 g $\pm$ 0.001 g, a purity of 53.2 % $\pm$ 3.0 %, and an amount of pure substance of  14.8 g $\pm$ 0.8 g.  By a DEA Laboratory report, dated July 27, 29015, drug exhibit 1B54 was determined  to contain d-Methamphetamine Hydrochloride, with a net weight of 974.5 g $\pm$ 1.0 g, a substance purity of 95.6 % $\pm$ 3.6 %, and an amount of pure substance of 931.6 g $\pm$ 35.5 g.

60.     On July 13, 2015, CHS 1obtained a sample of heroin from **Catalan.** While investigators met with CHS 1, TFO David Dickie traveled to the vicinity of **Catalan's** shop, 1209 Forest, Dallas, Texas, to establish surveillance. At 1:30 pm, the Complainant and SA Smylie met with CHS 1 at a pre-arranged location. SA Smylie provided CHS 1 with recording device and a transmitting device. CHS 1, who was conducting a number of meetings on this date, reported that he/she would first meet with **Catalan** to obtain the heroin sample. The Complainant directed CHS 1 that the investigators would meet with him/her after the meeting with **Catalan** to collect the heroin sample. At 1:40 pm, CHS 1 departed the meeting location, followed by the Complainant and SA Smylie.

At 1:52 pm, CHS 1 arrived at **Catalan's** shop. CHS 1 parked in front of the closed bay door. At 1:53 pm, CHS 1 exited his/her vehicle and entered the shop through the office door. At 1:54 pm, CHS 1 exited the shop and was observed on his/her cell phone. **Catalan's** red Infiniti SUV was observed on the south side of the shop in the shade. At 1:55 pm, CHS 1 re-entered the shop. At 1:56 pm, CHS 1 exited the shop, walked to the front passenger door of his/her vehicle, opened door, leaned into the vehicle, closed the door, and re-entered the shop. At 2:02 pm, CHS 1 exited the shop and was observed on his/her cell phone. CHS 1 re-entered the shop. The Complainant reported that CHS 1 had contacted him telephonically. CHS 1 reported that **Catalan** had three balls of heroin stashed in the alley behind the shop. The heroin was buried in a hole approximately half-way down the alley. At 2:20 pm, CHS 1 exited the shop, entered his/her vehicle, and departed the shop. At 2:24 pm, the Complainant, SA Smylie, and TFO Dickie met with CHS 1. SA Smylie took possession of the heroin sample.

61.    On July 13, 2015, CHS 1 provided the details of his/her meeting with **Catalan**. When CHS 1 walked into the shop, the old man worker, Jesus, was in the shop. **Catalan** was on his laptop computer. **Catalan** told CHS 1 that the heroin was in back of the shop. CHS 1 walked with **Catalan** into the area behind the shop. CHS 1 described a grey car parked along the northern yard fence. The heroin was buried between the grey car and the fence. CHS 1 estimated that **Catalan** had three ounces buried there. The ball of heroin was wrapped in clear plastic. **Catalan** cut the sample for CHS 1 from the larger ball using a razor knife. **Catalan** weighed the remaining heroin after he removed the sample. CHS 1 recalled that the ball of heroin weighed 23 ½ ounces. **Catalan** gave the sample to CHS 1. The remaining heroin was wrapped in yellow tape. Catalan had dug up the heroin with his hands. The heroin was not in a buried container, but was buried in the dirt. CHS 1 advised that the driver of a truck that arrived at the shop purchased cocaine from **Catalan**. **Catalan** retrieved the cocaine from a spray can with a false bottom. The can was on a shelf across from the shop office. **Catalan** weighed the ounce of cocaine and the truck driver paid him $1,100. The driver went to the truck, came back into the shop and then left. **Catalan** asked CHS 1 when the UCE would be back. CHS 1 told **Catalan** that the UCE would be in town on Friday, but he would be busy. CHS 1 told **Catalan** that the UCE would probably be back next month some time. **Catalan** also asked how many kilos the UCE would be buying. CHS 1 estimated that the UCE would be buying 5 kilos of Ice, 5 kilos of cocaine and a kilo of heroin. While CHS 1 was with **Catalan**, FG called **Catalan** five times. **Catalan** did not answer.

62.    On July 13, 2015, SA Tim Smylie transported a sample of heroin received as a free sample by CHS 1 from **Catalan** to the Dallas Evidence Control Room. The Complainant met SA Smylie at the evidence room and witnessed the packaging of the drugs. The black tar like substance was wrapped in a piece of white plastic with black writing. SA Smylie conducted a field test of the drug.

The drug tested positive for the presence of heroin. The heroin evidence, including the plastic and the drug, weighed a total of 2.0 grams. Once the drugs were sealed in a kpac evidence bag with the appropriate label, the total weight was 35.4 grams. The drug evidence was designated 1B 56. SA Smylie photographed the drugs and the packaging of the drugs. The evidence was then released to the temporary overnight storage facility of the Dallas FBI Evidence Control Room.

63.     On July 30, 2015, CHS 1 talked with FG and learned that **Flores** had been arrested.

64.     Based on the information that **Flores** had been arrested, the investigators conducted a search of law enforcement databases and learned that **Flores** had been arrested on July 26, 2015 by the Dallas Police Department for Possession of Marijuana, <= five (5) pounds > four (4) ounces, Manufacture/Delivery of a Controlled Substance, Penalty Group 1, >= one (1) gram < four (4) grams, and Unlawful Carrying a Weapon.

65.     On October 29, 2015, CHS 1 met with **Catalan** at **Catalan's** shop, 1209 Forest Lane, Dallas, Texas. 1:40 pm, CHS 1 met with the Complainant and SA Smylie at a pre-arranged location. At 1:45 pm, CHS 1 departed the meeting location, followed by the Complainant and SA Smylie. TFO Dickie traveled directly to the vicinity of **Catalan's** shop. At 2:01 pm, CHS 1 arrived at **Catalan's** shop and exited his/her vehicle. At 2:13 pm, CHS 1 called the Complainant and provided the license plate on a tan Tahoe which was at the shop, CBG 1659. CHS 1 also reported that the driver of the Tahoe, Manuel, was trying to sell a 9 mm weapon with a 30 round magazine for $500 and a bullet proof vest for $300. The CHS described Manuel. The Complainant asked CHS 1 to get Manuel's number and tell him that he/she would call him later to let him know whether he/she would buy the items. CHS 1 provided Manuel's number as XXX-XXX-3729. At 2:15 pm, the Tahoe departed the shop. The Tahoe traveled south on Forest, west on Lamar and north on South. The Complainant observed the driver, who matched the description provided by the CHS. At 2:54 pm, CHS 1 exited the shop, entered his/her vehicle and departed the shop. The CHS traveled to meet the Complainant and SA Smylie. CHS 1 was followed to the meeting location by SA Farrell. CHS 1 called the Complainant and reported that **Catalan** had provided him/her with a sample of cocaine. CHS 1 also reported that **Catalan** saw TFO Dickie's vehicle. At 3:01 pm, CHS 1 met with SAs Farrell and Smylie. CHS 1 immediately provided the cocaine sample to the Complainant. The sample was wrapped in a folded piece of white paper.

66.     On October 29, 2015, CHS 1 provided the details of the meeting with **Catalan**. CHS 1 described the weapon that Manuel, later identified from his driver's license photograph as **Manuel Gonzalez**, was trying to sell as looking similar to an Uzi. The weapon had a thirty round magazine. The vest was a black bullet proof vest.

**Criminal Complaint – Page 30**

CHS 1 stated that **Gonzalez** sells drugs for **Catalan** and he was trying to get **Catalan** to accept the gun and the vest as payment for his debt to **Catalan**. **Catalan** told **Gonzalez** that he did not want the two items and he wanted the money. CHS 1 asked **Catalan** whether he could talk to **Gonzalez** about the gun and the vest. **Catalan** told CHS 1 to go ahead and talk to **Gonzalez**. **Gonzalez** did not say where he got the gun or the vest. **Gonzalez** told CHS 1 that he would be willing to sell the gun and vest to him/her. **Gonzalez** told CHS 1 to call and CHS 1 agreed to call **Gonzalez** after noon on Friday, October 30, 2015. CHS 1 believed that **Catalan** would be happy for CHS 1 to buy the gun and the vest so that **Gonzalez** would pay him what he owes. CHS 1 stated that **Gonzalez** may have been picking up drugs from **Catalan**, but he/she did not see the exchange. If **Gonzalez** did pick up something from **Catalan**, CHS 1 believed that at the most he would have picked up an ounce. Based on what he/she overheard, CHS 1 believed that **Gonzalez** buys cocaine from **Catalan**. The kilogram of cocaine that **Catalan** showed to CHS 1 and from which he obtained the sample was broken in half. The one side of the kilo was stamped with small squares. **Catalan** had the kilogram in a cardboard box, which was in the office. The kilogram was in the box under a pile of clothes. The kilogram was in a zip lock plastic baggie. The cocaine had a shiny appearance.

67.    On October 29, 2015, the Complainant transported a sample of cocaine obtained by CHS 1 from **Catalan** to the Dallas FBI Evidence room. The Complainant was met by SA Tim Smylie. SA Smylie took five (5) photographs of the drugs, the packaging of the drugs and the weighing of the drugs. The cocaine was wrapped in a folded piece of white paper which had the logo for Huffines Hyundai. The cocaine and the paper weighed 1.5 grams. The cocaine was field tested and the test was inconclusive. Once the cocaine was packaged in the kpac bag and sealed with the evidence label the total package weight was determined to be 34.4 grams. The cocaine was designated 1B 69.

68.    On October 30, 2015, CHS 1 conducted a controlled buy of a weapon from **Gonzalez**, a worker for **Catalan** at **Catalan's** shop, 1209 Forest Lane, Dallas, Texas. At 2:07 pm,  The CHS met with the Complainant and ATF SA Finney and TFO Dickie at a pre-arranged location. At 2:08 pm, CHS 1 placed a call to **Gonzalez**. **Gonzalez** told CHS 1 that he was in the neighborhood of **Catalan's** shop. CHS 1 told **Gonzalez** that he/she would be there in a ten minutes. SA Finney provided CHS 1 with $500 in ATF buy money. CHS 1 brought up that he/she thought that **Gonzalez** may have asked $550 for the gun. In response, the Complainant provided CHS 1 with an additional $50. At 2:19 pm, CHS 1 departed the meeting location, followed by the Complainant, SA Finney and TFO Dickie. At 2:22 pm, FBI IOA Mike Spencer, who was monitoring an electronic surveillance system monitoring **Catalan's** shop, reported that **Gonzalez's** tan Chevrolet Tahoe arrived at **Catalan's** shop.

At 2:23 pm, **Gonzalez** moved to the rear hatch of the Tahoe, opened the rear hatch and removed something, which based on its shape, SIA Spencer believed to be a gun, from the rear area of the Tahoe. **Gonzalez** then entered **Catalan's** shop. At 2:30 pm, as CHS 1 was turning off of Lamar onto Forest, the Tahoe departed the shop and traveled west on Lamar. CHS 1 pulled into **Catalan's** shop. At 2:31 pm, CHS 1 exited his/her vehicle and entered the shop. At 2:33 pm, CHS 1 briefly returned to his/her vehicle. At 2:35 pm, CHS 1 re-entered the shop. At 2:58 pm, **Gonzalez's** Tahoe was observed traveling east on Lamar, north on Forest and pulling into **Catalan's** shop. CHS 1 and **Gonzalez** were overheard discussing the purchase price and **Gonzalez** quoted a price of $500. At 3:00 pm, the Tahoe departed the shop and traveled north on Forest. At 3:01 pm, CHS 1 exited the shop carrying the same item that **Gonzalez** had removed from the rear of his Tahoe. CHS 1 placed the item into the truck of his/her vehicle and entered the vehicle. At 3:02 pm, CHS 1 pulled out of **Catalan's** shop. CHS 1 was followed from **Catalan's** shop by the Complainant and SA Finney. TFO Dickie also followed CHS 1 at a distance. At 3:11 pm, CHS 1 met with the Complainant, SA Finney and TFO Dickie. CHS 1 immediately provided the weapon purchased from **Gonzalez** to the Complainant and SA Finney. SA Finney took five photographs of the weapon. The weapon was identified as an AA Arms, model AP 9, 9 mm, serial number 013070. The weapon was accompanied by a 30 round magazine, which had some rust. The weapon was wrapped in a black T shirt. CHS 1 provided SA Farrell with the $50 in additional buy money.

69.     On November 16, 2015 in anticipation of a meeting with **Catalan** to introduce the UCE to **Catalan**, CHS 1 met with the Complainant, SA Tim Smylie and UCE 5357. At 2:29 pm, CHS 1 and the UCE departed the meeting location en route to **Catalan's** shop. At 2:35 pm, CHS 1 and the UCE arrived at **Catalan's** shop, 1209 Forest, Dallas, Texas. At 2:36 pm, CHS 1 and the UCE exited CHS 1's vehicle and entered a Ford Expedition parked at the shop. At 2:38 pm, a black male, wearing a cowboy hat walked up to the shop. **Catalan** exited the Expedition and **Catalan** and the black male entered the shop. CHS 1 called the Complainant and advised that he/she had overheard **Catalan** tell the black male that he hoped the black male had his money. CHS 1 reported that the black male was wearing a cowboy hat and a jeans jacket. At 2:41 pm, **Catalan** and the black male exited the shop. A white Ford dually pickup truck, Texas license BZ46440, arrived at the shop. **Catalan** moved to the truck. At 2:46 pm, **Catalan** returned to the Expedition and the white Ford dually truck departed. A silver Nissan Altima, Texas license DGY 5374, parked at the southeast corner of the shop and a black male exited the Altima. **Catalan** exited the Expedition and entered the shop. **Catalan** and the black male exited the shop, moved to the Altima and appeared to be looking at the car. At 2:49 pm, the Altima departed the shop and **Catalan** returned to the Expedition. At 3:00 pm, CHS 1 and the UCE exited the Expedition and departed the shop.

70.     On November 16, 2015, CHS 1 and UCE 5357 provided the details of their meeting with **Catalan**. CHS 1 and the UCE talked to **Catalan** about the Denver UCE buying 5 kilos of Ice and 5 kilo of cocaine in January. **Catalan** told them that as long as he had 2 or 3 days notice, he would be able to supply whatever the UCEs wanted. **Catalan** told them that depending on the timing of the deal, the prices per kilo of both Ice and cocaine could fluctuate $500 up or down. **Catalan** told the UCE to let CHS 1 know a week ahead of time when the deal would occur and how many he wanted to buy. **Catalan** told the UCE that he would close the shop for the day of the deal so that no one would be around. **Catalan** asked CHS 1 whether he/she had talked with FG. CHS 1 told **Catalan** that they had just met with FG.

71.     On January 19, 2016, further investigation was conducted regarding the silver 2006 Hyundai Tiburon, registered to **Artemio Villa Hernandez**, XXXX Sugarleaf, Dallas, Texas, which delivered the kilogram of methamphetamine to Catalan's Shop on December 17, 2014. Investigators located a FaceBook page in the name **Artemio Villa Hernandez.** One of the photographs on **Hernandez's** FaceBook page depicted **Hernandez** in a vehicle with a Hyundai emblem on the steering wheel. A photograph from Hernandez's girlfriend's page depicted the girlfriend with a silver Hyundai Tiburon in the background.

72.     On January 19, 2016, SA Smylie texted CHS 1 the FaceBook photograph of **Artemio Villa Hernandez.** CHS 1 immediately responded that the individual in the photograph was the young Hispanic male who delivered drugs to Catalan's Shop in the small silver car.

73.     Since the last controlled buys detailed above, CHS 1, UCE 4532 and UCE 5357 have been negotiating with **Catalan** to begin a relationship where **Catalan** and the others would supply CHS 1, UCE 4532 and UCE 5357 with routine supplies of large amounts of cocaine and Ice. CHS 1 and UCE 4532 had promised to make a large purchase from **Catalan** and the others in January 2016. Because of investigative demands, CHS 1 has been delaying this purchase. The discussions with **Catalan** involved the purchase of ten (10) total kilograms of cocaine and methamphetamine from **Catalan. Catalan** has told CHS 1 that the suppliers would be able to provide the drugs and could sustain the supply on a routine basis.

74.     Based on the foregoing, the Complainant believes that probable cause exists that **Marcos Batz, Heliodoro Catalan, Jose Flores, FNU LNU 1, Artemio Villa Hernandez**, and **Manuel Gonzalez** and other yet unknown, have committed offenses involving violations of Title 21, United States Code, Section 841(a)(1)(Possession of a Controlled Substance with the Intent to Distribute); United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance); and Title 18, United States Code, Section 2 (Aiding and Abetting the above-described offenses.

02/05/16
_____
Date

Andrew D. Farrell
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence, __5th__ day of February 2016, at
_11:48_ a.m./p.m. at Fort Worth, Texas.

JEFFREY L. CURETON
United States Magistrate Judge

**Criminal Complaint – Page 34**